# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-102 (JDB)** |
| **v.** | : | |
| | : | |
| **MELANIE LANHAM** | : | |
| **also known as** | : | |
| **MELANIE M. ARCHER,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Melanie Lanham to 30 days incarceration as a condition of a three-year term of probation pursuant to 18 U.S.C. § 3563(b)(10), 60 hours of community service, and $500 in restitution.

### I.      Introduction

Defendant Melanie Lanham—a 43-year-old small business woman from Pittsburgh, Pennsylvania, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on October 24, 2022, (ECF No. 32 at ¶ 11) reflects a sum of more than $2.7 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Lanham pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G) (Unlawful Parading, Demonstrating, or Picketing in a Capitol Building). As explained herein, a sentence of 30 days of incarceration as a condition of a three-year term of probation, 60 hours of community service, and $500 in restitution is appropriate in this case because Lanham (1) walked through the chaos on the West Plaza, during which she observed police using tear gas against rioters, rioters climbing outdoor scaffolding and one rioter "squirting" something at police; (2) nevertheless entered the Capitol building through the Upper West Side doors with other rioters after police officers had to retreat from that area; (3) penetrated the Capitol all the way to a third floor hallway adjacent to Speaker Pelosi's private office suite; (4) described her experience as "amazing" the next day on social media; and (5) has yet to sincerely express genuine remorse, over two years after her criminal conduct on January 6.[2]

The Court must also consider that Lanham's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Lanham's crime support a sentence of 30 days incarceration in this case.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 32 (Statement of Offense), at 1-7.

---

[2] Lanham was jointly charged with Jordan Bonenberger.  His case is ongoing.

*Defendant Lanham's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Melanie Lanham traveled with co-defendant Jordan Bonenberger ("Bonenberger") to Washington, D.C., from her home in Pennsylvania to attend the "Stop the Steal" rally. After attending the rally with Bonenberger, Lanham walked to the U.S. Capitol. She took photographs of rioters climbing scaffolding on the West side of the Capitol, as well as police confronting police rioters outside the building with tear gas visible.




*Image 1*            *Image 2*

At approximately 2:44 p.m., Archer entered the Capitol through the Upper West Side Central doors, approximately 10 minutes after those doors were first breached and just after officers guarding the door retreated. *See* "New Capitol Surveillance Footage Shows A Breach By Jan. 6 Rioters From Start To Finish," Buzzfeednews, *available at* www.buzzfeednews.com/article/zoetillman/capitol-footage-police-trump-insurrection-mob (last accessed Feb. 2, 2023).



*Image 3*

The door was alarmed and went off as the doors were breached.  The alarm was still blaring when

Lanham entered the hallway, which was lined with boxes.

Lanham and Bonenberger then walked to the Rotunda, as shown in Image 4.



*Image 4*

Lanham also walked through a corridor on the third floor of the Capitol building.  Image 5

shows Archer with Bonenberger in the corridor at approximately 2:55 p.m.



***Image 5***

This area of the Capitol contains part of the Office of the Speaker.  While in this area, Lanham took a selfie, below as Image 6, next to a door marked "Office of the Speaker."



***Image 6***

Lanham then exited the Capitol through the Upper West Terrace doors at approximately 2:57 p.m.  She remained on the Western Exterior steps for several minutes and took photographs of herself, police, and the crowd of rioters.



***Image 7***

In total, Lanham spent approximately 15 minutes inside of the Capitol. She has admitted that she knew at the time she entered the U.S. Capitol Building that she did not have permission to do so.

*Social Media Posts and Communications*

After the attack on the Capitol, Lanham made social media posts and sent communications about January 6.  Lanham posted messages to her Facebook account disputing news coverage of the riot.  For example, Lanham posted the following message:



On January 7, 2017 at approximately 10:30 a.m., Lanham sent an email to hello@join1440.com[3] with the subject line "I was at the Capitol building yesterday."  The message of the email stated:

> And I was one of the few hundred that got in.  It was not as they are reporting. . . . I was THERE . . . in it all.  It was amazing and handful of Trump posing Antifa were not a representation of the millions who were there.  I was surrounded by grandmas and grandpas and ppl from every walk of like and different nationalities, black white, gay straight . . . . it was a very diversified group.  And it was AMAZING          .          .          .          .          !!!

Lanham attached the following image to her email, which was taken on the Western Exterior steps after she exited the Capitol:

---

[3] Join 1440 is a daily email newsletter.



*Image 8*

She similarly sent a message via Instagram on January 7, 2021 at approximately 10:53 a.m., stating "I was there yesterday . . . . . . at the Capitol building. . . . . I was liiiiin that . . . . like on the front line . . . . . . it was amazing."

*Lanham's Post-arrest Interview with the FBI*

On March 21, 2022, Lanham gave a voluntary post-arrest interview to the FBI. During the interview, she advised that she drove with Bonenberger to attend the rally on January 6, 2021. Once they arrived in Washington, D.C., they visited several monuments and then went to an area near the rally.

Lanham stated that after Trump's speech was over, she and Bonenberger joined the crowd and walked down Constitution Avenue to the Capitol. She explained that she heard what she believed were tear gas canisters being launched, and she saw people moving past her who appeared to have been exposed to tear gas. She also acknowledged witnessing people climbing on scaffolding and a person "squirting" police with a fire extinguisher.

Lanham explained that she and Bonenberger became separated in the crowd, and he contacted her and said people were being let into the Capitol. When she arrived, police were guarding the door.  She claimed the crowd was being respectful of the police officers and she did not enter because it appeared she was not allowed to go in. However, she further explained that when the police officers left their position, she and others entered the Capitol.  Lanham then reunited with Bonenberger.

During her interview, she attempted to downplay her actions by stating that she never questioned whether it was ok for her to be in the Capitol building.[4]  There is no evidence to suggest that individuals were let into the Capitol, regardless of what she may have been told by Bonenberger.  She knew police officers were guarding the door, the hallway lined with boxes did not have any indicia of being a lawful entrance to the building, and she would have heard the blare of the security alarm and seen the chaos on the West Plaza when she entered.

Lanham stated that she and Bonenberger walked through the "Hall of Presidents" in a big Rotunda and then a smaller room.[5]  Lanham said tear gas had been deployed. She claimed she feared she would be trampled by the crowd and moved toward an outside wall and hid behind a statue until she could safely exit.  During this time, she said she and police officers provided water to rioters.

According to Lanham, she urgently needed to use the restroom while in the Capitol, and she and Bonenberger got into an elevator.  She said she found a restroom, but the door was locked. Lanham and Bonenberger got back into the elevator and exited the building.

---

[4] The government recognizes that the interview took place after she voluntarily surrendered to the FBI and she has subsequently pleaded guilty and acknowledged that she knew when she entered that she did not have permission to be there.
[5] The government understands that Lanham was referring to the Capitol Rotunda.

In sum, she admitted that she entered the U.S. Capitol building on January 6, 2021. During her interview, she acknowledged making social media posts and provided information about her cell phones.  Lanham voluntarily agreed to provide the contents of her current phone to law enforcement officials.

<em>The Charges and Plea Agreement</em>

On March 14, 2022, the United States charged Lanham by criminal complaint with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On March 21, 2022, Lanham voluntarily surrendered to law enforcement officials in Pittsburgh, Pennsylvania. On March 28, 2022, the United States charged Lanham by a four-count Information with those same violations. On October 24, 2022, pursuant to a plea agreement, Lanham pleaded guilty to Count Four of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building. By plea agreement, Lanham agreed to pay $500 in restitution to the Department of the Treasury.

### III.   Statutory Penalties

Lanham now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Lanham faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the

nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of the recommended sentence of 30 days incarceration, three years of probation, and 60 hours of community service.

### A.  The Nature and Circumstances of the Offense

"[T]he attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Lanham's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Lanham, the absence of violent or destructive acts is not a mitigating factor. Had Lanham engaged in such conduct, she would have faced additional criminal charges.

On the West Front of the Capitol, Lanham saw rioters on scaffolding and observed rioters "squirting" police with a fire extinguisher.  Despite these circumstances, she advanced toward the Capitol and made entry to a non-public, alarmed entrance.  Thus, she took advantage of the opportunity presented by the mob, ignored the obvious signs of violence taking place, and unlawfully entered the building.

Under all of these circumstances, Lanham knew that she was not permitted to be in the Capitol building, yet she entered it and remained inside anyway for almost 15 minutes.  One of the most important factors in Lanham's case is the fact that she traveled to a sensitive area of the Capitol even after seeing tear gas deployed within the Capitol and being fearful that she would be trampled by the crowd. Although she claimed in her interview that she did so because she urgently needed to use the bathroom, while in the hallway she took a selfie next to a door marked with "Office of the Speaker" with her tongue sticking out. After leaving the Capitol building, she remained on the steps and similarly posed jauntily next to police officers in celebration. Despite having observed rioters "squirt" police with a fire extinguisher, tear gas deployed inside and outside of the Capitol, and fearing for her own personal safety, the next day, she described the events of January 6 as "amazing."

Accordingly, the nature and the circumstances of the offense support the recommended sentence of 30 days incarceration.

### B.  The History and Characteristics of Lanham

As set forth in the PSR, prior to her conduct on January 6, 2021, Lanham appears to have led a productive, law-abiding life.  PSR §§ 29-44.  Lanham is a self-employed organizer, de-clutterer and event planner.  PSR § 44.  She has no criminal history.  PSR §§ 23-28.  Lanham has been compliant with her conditions of pre-trial release.  Following her arrest for the charges in the instant case, Lanham acknowledged her conduct and expressed a desire to promptly resolve her case.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration,

as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Lanham's actions on January 6, 2021, as well as her subsequent postings and communications and lack of remorse, demonstrate the need for specific deterrence for this

defendant.  She ignored obvious indicators of mayhem when she entered the Capitol and continued in her path through the workplace of Congress, even though she claims she was fearful she would be trampled by the crowd. She took boastful selfies to document her experience, which she described as "amazing." Thus, the United States recommends a short sentence of incarceration to convey to Lanham that her conduct on January 6 had grave consequences

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[6] This Court must sentence Lanham based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.

Lanham has pleaded guilty to Count Four of the Information, charging her with Parading, Demonstrating, or Picketing in the Capitol Building, in violation of 18 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found

---

[6] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted.  *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan).

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section

3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense

is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may consider sentences of Capitol breach defendants who spent time in sensitive places within the Capitol. A defendant's entry into a sensitive space, such as the Senate Floor or a member's office, places that defendant in a more serious category of offenders than defendants who remained in central, more public spaces, such as the Rotunda. In this case, Lanham traveled to the third floor of the Capitol building where many staff offices are located. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people.

To that end, while no previously sentenced case contains the same balance of aggravating and mitigating factors present here, *United States v. Michael Timbrook*, 21-CR-361 (TNM), provides a suitable comparison to the relevant sentencing considerations in this case.  While Timbrook ignored the directions of police officers and witnessed the violent assault of officers within the Capitol, other facts of his case resemble Lanham's.  Timbrook entered the Capitol despite observing assaults against police officers prior to entering the Capitol building.  Timbrook, like Lanham, was part of an early group entering just after a door was breached.  Timbrook also traveled to a sensitive and restricted access area when he entered the Office Suite of the Speaker of the House.  Moreover, he did not express remorse, but repeatedly expressed pride in his participation in the riot on social media. In *Timbrook*, the government requested 90 days in custody followed by a three-year term of probation.  Judge McFadden sentenced Timbrook to 12 months of probation with 14 days intermittent incarceration.

In *United States v. Thomas Fassell*, a 68-year-old man entered the Capitol after observing mayhem on the West Plaza and ultimately traveled to Speaker Pelosi's office suite.  Although Fassell spent a longer period of time in the Capitol—40 minutes as compared to the approximately 15 minutes Lanham was inside—they both made statements after January 6 showing pride rather than remorse or contrition. In *Thomas Fassell*, the government requested 30 days incarceration, three years' probation, 60 hours of community service, and $500 in restitution, and Judge Kollar-Kotelly sentenced Fassell to 12 months of probation with 14 days intermittent incarceration.

In another comparable case, *United States v. Mazzocco*, the defendant entered the Capitol, spent time in the Spouse's Lounge, took several smirking selfie photographs, and left the Capitol approximately 12 minutes later.  Like Lanham, Mazzocco downplayed the seriousness of the events on social media.  But unlike Lanham, Mazzocco entered the Capitol long after it had been

breached and expressed remorse.  Judge Chutkan sentenced Mazzocco to 45 days' incarceration, 60 hours of community service and $500 in restitution.   *See United States v. Mazzocco*, Case No. 21-CR-0054 (TSC) (10/4/21 Sentencing Tr.).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. [7]

---

[7] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *see generally Appellee's Brief for the United States, United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law.

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(1), which authorize limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have

V.      **Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Lanham to 30 days incarceration as a condition of a three-year term of probation pursuant to 18 U.S.C. § 3563(b)(10), 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior, while recognizing her acceptance of responsibility for her crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     s/ *Sarah W. Rocha*
        SARAH W. ROCHA
        Trial Attorney
        D.C. Bar No. 977497
        219 S. Dearborn Street, Fifth Floor
        Chicago, Illinois 60604
        Telephone:  202-330-1735
        sarah.wilsonrocha@usdoj.gov

---

imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992). In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

### <u>CERTIFICATE OF SERVICE</u>

On this 2nd day of February 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

*/s/ Sarah W. Rocha*
Sarah W. Rocha
Trial Attorney